Judgment rendered January 10, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,435-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

CARLIN TREMELL COTTON                        Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 386,171

Honorable Christopher T. Victory, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Edward K. Bauman

JAMES E. STEWART, SR.                 Counsel for Appellee
District Attorney

SAMUEL S. CRICHTON
TOMMY J. JOHNSON
Assistant District Attorneys

* * * * *

Before STONE, ROBINSON, and MARCOTTE, JJ.

MARCOTTE, J.

This criminal appeal arises from the First Judicial District Court, Parish of Caddo, the Honorable Chris Victory presiding. Defendant Carlin Tremell Cotton appeals his conviction for second-degree murder and his sentence of life imprisonment at hard labor without benefits. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On February 16, 2022, Cotton was charged by bill of indictment with second-degree murder, in violation of La. R.S. 14:30.1. The crime occurred on August 18, 2021, in Shreveport, Louisiana, and the victim was Cedric Cemoyne Fuller ("Fuller"), Cotton's alleged half-brother. Cotton pled not guilty. A jury trial was held January 23-26, 2023, where the following evidence was adduced.

Brenretta Richardson-Anderson ("Richardson") testified that she was at her mother's house on the day of the shooting. Her mother lived behind the home of Gloria Fuller ("Gloria"), Fuller's mother. Gloria lived at 4206 Baxter Street, Shreveport, Louisiana. From inside her mother's home Richardson heard several gunshots, a brief period of quiet which she described as "a pause," and then three to four more shots. She saw, from her mother's home, a white Chevy Impala pull out of the driveway at or near 4206 Baxter Street. Shortly thereafter, a neighbor informed her that there had been a shooting. Richardson walked toward Gloria's house and saw Fuller on the ground.

Richardson stated that Fuller and Cotton had the same father, and she saw a white Chevy Impala at Gloria's house often. She said that Fuller went by the nicknames "Maniac" or "Yak," but she did not know why.

Richardson testified that she did not hear anything prior to hearing the shots, such as a verbal argument. She did not know Fuller to wear brass knuckles, but stated that they only saw each other in passing.

Fuller's sister, Tomiko Cain ("Cain"), testified that Fuller was living and working in Texas at the time of the shooting, but he had come to Shreveport to visit his mother on the day of his death. She said that Fuller was first called "Maniac" or "Yak" when he was a child. Cain stated that the front of her mother's home included a carport which Gloria had enclosed in plastic sheeting.

Cain stated that Cotton was alleged to be Fuller's half-brother. She arrived at Gloria's house after her brother was shot and transported to the hospital to find her mother in a state of distress and being treated by paramedics. She said that she never knew Fuller to wear brass knuckles. Cain knew her brother was arrested in 2019, but she did not know that he was arrested for attempted possession with intent to distribute marijuana.

Gloria testified that Fuller was 45 years old when he died and that he got the nickname "Maniac" when he was a child. Gloria owned a 2015 Cadillac Escalade, which only Fuller was allowed to drive. Fuller came to Shreveport on the day of his death, August 18, 2021, and was inside Gloria's house on Baxter Street when Cotton arrived. She said that it rained prior to the shooting and there was a puddle in her yard.

Gloria was inside her carport/patio that she had enclosed with plastic sheeting when Cotton arrived. She first realized Cotton was there when she saw the plastic sheet shaking, meaning someone was touching it. Gloria asked who was outside and Cotton identified himself and entered the carport.

Gloria first met Cotton when her husband, Ray Fuller ("Ray"), Fuller's father and Cotton's alleged father, was alive. Gloria stated that Ray died in 2010, and Cotton would come to her house often to see him and the victim. Fuller and Cotton referred to each other as brothers. Gloria said that she was unaware of any financial arrangement between Fuller and Cotton.

Gloria said that Cotton was not acting normal that day and his eyes were red. While Cotton was speaking with Gloria, Fuller entered the carport from the house and walked past his mother and Cotton out to the driveway, where the Escalade was parked at an angle. Gloria testified that Cotton and Fuller did not speak to each other, and she heard nothing while she was sitting in the carport. A few minutes later, Cotton left the carport and went toward the driveway; Gloria also left the carport, entered her house, and went into the den.

Gloria then heard several gunshots, which she said sounded close. She went to her front door, opened it, and looked out, but did not see anything. She closed the door and proceeded down the hallway and then heard several more shots. Gloria "hollered" for Fuller, but he did not respond. She went outside to the Escalade, walked around it, and discovered Fuller lying face down beside it in a puddle. Gloria stated that she was the first person to find Fuller's body and no one else was around. She ran inside her house, retrieved her cell phone, returned to Fuller, and called 911. She said that police arrived, pulled Fuller out of the puddle, and turned him over; paramedics arrived and transported him to the hospital.

Gloria's 911 call and her statement to the police were played for the jury. Gloria can be heard in the recording in extreme distress. The 911 operator had to repeatedly ask her for her address and information about

3

who was shot.  Gloria testified that the 911 operator told her to apply pressure to Fuller's wounds, but she testified, "I couldn't do anything but scream."  Gloria said that neither was she composed when the police arrived at her house and paramedics had to work on her to get her blood pressure down.

Gloria never knew her son to carry brass knuckles, and she did not see anyone disturb or remove brass knuckles from Fuller's body.  Gloria testified that she did not hear voices, talking, arguing, or screaming before, during, or after the shots rang out.  She stated that, if there had been an argument in her driveway, she would have heard it.  She said that the windows to her house were closed at the time of the shooting, and no one else was present at her home when her son was shot.  Gloria stated that she did not hear anyone say on August 18, 2021, "Mama, throw me my gun."  She was not aware of any guns that Fuller kept in her home, she never saw him bring a gun into her home, and she had not found a gun in her home since her son died.

Officer A. Visciotti ("Off. Visciotti") was working patrol for the Shreveport Police Department ("SPD"), when he was dispatched to the scene of Fuller's murder on Baxter Street on August 18, 2021.  Off. Visciotti received the call at approximately 6:00 p.m. when it was still light out; it had been raining earlier that day, but it was not raining at the time of the shooting.  Off. Visciotti testified that he was the first officer to arrive, and he observed Fuller lying face down on the left side of a Cadillac Escalade near the driver's door in approximately three to five inches of water, which was tinted red.  Fuller's hands were in the water.

4

Off. Visciotti testified that he pulled Fuller's body forward to get him out of the water and flipped him onto his back in order to perform life-saving measures. He stated that Fuller's clothing and pockets were wet and he was bleeding. Off. Visciotti observed shell casings in the road, but he did not see any blood other than the blood around Fuller. The rear hatch to the Escalade was open and he saw a cell phone and brass knuckles placed there, side-by-side. Off. Visciotti stated that he arrived on the scene about 2 minutes and 15 seconds after he received the call about Fuller's shooting and the crime scene was unattended during that time. He said that multiple people were walking around the scene and could have disturbed the evidence. Off. Visciotti said that Gloria was distraught when he arrived at her home, but she did not make a statement to him that she had removed brass knuckles or a phone from Fuller's body.

The dash cam recording from Off. Visciotti's patrol vehicle was played for the jury and confirmed his testimony. It was raining before he was dispatched to the scene. He received the call at 6:14 p.m., and he arrived at the scene at 6:16:09 p.m. When he arrived, several people there were moving around and in distress. Gloria could be seen screaming, crying, wandering around, and in distress before she was ushered out of the dash cam's view. Later, an officer could be heard requesting help from paramedics to attend a woman who fainted out of view of the camera.

Sergeant Hannah Clark ("Sgt. Clark"), a crime scene technician for SPD, testified that she responded to a reported shooting that occurred on Baxter Street on August 18, 2021. Sgt. Clark first went to the hospital where Fuller was transported to photograph his body. She stated that she took pictures of Fuller's hands and knuckles and no bruising or cuts were present

5

to indicate that he had participated in a fistfight before his death. The photographs were admitted. No bruising, cuts, or injuries to Fuller's hands can be seen in the photos.

Sgt. Clark then went to the scene of the shooting. Upon arriving, Sgt. Clark noticed an SUV with its hatch door up parked at an angle in the driveway. There were also seven .40 caliber shell casings marked with numbered placards on the ground, west of the SUV. Sgt. Clark testified that there were two distinct sets of shell casings grouped together on the ground. There was also one projectile on the ground near the SUV, and the driver's side of the vehicle had an indentation in it, consistent with it being hit by a projectile which did not penetrate the door.

She observed a cell phone and brass knuckles made of metal in the back end of the SUV. Sgt. Clark stated that she did not see anything on the brass knuckles, such as blood, moisture, dirt, or debris. She swabbed the brass knuckles for DNA and placed them into a sealed evidence bag, but she did not attempt to get any fingerprints from them. Sgt. Clark took additional photographs of the crime scene which were admitted and are consistent with her testimony.

Dr. James Traylor ("Dr. Traylor"), who was accepted as an expert witness in forensic pathology, testified about the autopsy he performed on Fuller. Fuller was 6 feet, 195 pounds, and tested positive for natural marijuana at the time of his death. Fuller had five gunshot wounds, one penetrating, three perforating, and one grazing. Dr. Traylor described the wounds as being from distant range of fire, meaning that the muzzle of the gun was more than 18 inches from Fuller when he was shot. Dr. Traylor explained that a penetrating shot is one where the bullet goes into the body

6

but does not exit; a perforating shot is one where the bullet goes into the body and exits, leaving entry and exit wounds in the body; and a grazing shot is one where the bullet only grazes the body, but does not go into the body.

The diagram Dr. Traylor made of Fuller's gunshot wounds was admitted. The diagram shows that Fuller was shot five times, all on his left rear side, from his thigh to his mid-back. Dr. Traylor stated that two of the five bullets that struck Fuller created fatal wounds. The first, a perforating shot, entered Fuller's left mid-back and exited just below his right nipple, damaging two ribs, his left lung, and the right ventricle of his heart. The second, a penetrating wound, entered his left buttock, hit his right common iliac artery, perforated two loops of his small bowel, and then lodged in his abdomen. Photos of Fuller's autopsy were admitted. Dr. Traylor stated that he observed no injuries to Fuller's hands and his manner of death was homicide.

On cross examination, Dr. Traylor testified that it was impossible to determine which shot was fired first, and he agreed that it was common for people to turn away from being shot. Dr. Traylor stated that he did not test Fuller for synthetic cannabinoids. Dr. Traylor acknowledged that it was possible "with a good-fitting pair" of brass knuckles that a person could inflict a lot of injury, but have no injury to himself.

On redirect, when asked, "If you have a weapon, and I'm running toward you, can I sustain these injuries," (referring to Fuller's gunshot wounds) "Dr. Traylor responded, "No." He stated that with the fatal wounds Fuller sustained, he would have been debilitated before dying and unable to fight, but his death would not have been instantaneous.

7

Detective T. Wesley ("Det. Wesley"), a homicide detective for SPD, was the lead detective in the investigation into Fuller's death. He testified that he was dispatched to 4206 Baxter Street on the date Fuller was killed; he arrived at 6:13 p.m. When he arrived on scene, he saw paramedics rendering aid to Fuller, who was lying on the ground; Fuller was transported to a hospital and later pronounced dead. Det. Wesley observed a white Escalade SUV parked diagonally in the driveway of Gloria's house, with part of the rear of the vehicle sticking out into the street.

Det. Wesley said that the hatch door and front driver's side door of the SUV were open. Crime scene markers were placed on the ground near spent shell casings from a handgun. Det. Wesley observed a water puddle on the ground near the driver's side door which had a reddish tint. The driver's side front door was later closed in order to take a photograph of a defect in the door, which Det. Wesley stated appeared to have been caused by a bullet striking the door. Det. Wesley observed a cell phone and brass knuckles, which had been "neatly placed" in the hatch of the SUV. He did not observe any dirt, debris, moisture, or water on the brass knuckles. He stated that he did not see or find any other weapons or harmful objects in the area.

Det. Wesley confirmed that Richardson's and Gloria's testimony about hearing two sets of shots with a pause in between them was consistent with their statements to law enforcement. Det. Wesley affirmed that Gloria did not say to law enforcement that she moved the brass knuckles, but she reported that she immediately went inside her home to call 911. Det. Wesley also confirmed that Gloria informed the police that she did not see anyone else around when she found her son's body on the ground. Det. Wesley stated that Gloria told law enforcement that, when she saw Cotton

8

on the day of Fuller's death, he was "talking irrational," was stumbling, and his eyes were "bloodshot red." Gloria did not tell police she heard Fuller say, "Mama, go get my gun."

Det. Wesley reviewed a 911 call that Cotton made, saying that his brother beat him with brass knuckles, so he then pulled out a gun and shot him. Cotton made a phone call from jail on January 1, 2023, to his mother Sandra Goode ("Goode"), a recording of which was admitted and played for the jury. In the call, Cotton stated that the autopsy report was incorrect and that the state should not have been able to use it against him. Cotton said that he did not know how he was going to be able to claim self-defense, because the autopsy report stated that Fuller was shot in the back. He told his mother several times that Fuller "came at" him and that's why he shot him.

When Goode asked Cotton if he shot Fuller in the back, he said "Yes, I did, and no, I didn't. I shot him when he asked for the gun. I, uh, that's when I shot him when he was on the ground. It appears the gunshot wounds were in the back." Det. Wesley reiterated that no firearm was discovered in the vicinity of where Fuller was found, including the SUV, but the detective acknowledged that he did not ask to search Gloria's house for firearms.

Det. Wesley agreed that SPD Sergeant Mendel's police report noted that she observed water droplets or moisture on the brass knuckles at the scene. He did not see the same on the brass knuckles, which he inspected when he first arrived at the scene. Det. Wesley stated that it was not raining at the time of the shooting. Det. Wesley said that the way the phone and brass knuckles were placed in the SUV was suspicious, because of how neatly they were placed there; it did not look like someone threw them in the

9

vehicle. Det. Wesley said that the cell phone was Fuller's and he did not get any information from the phone.

Det. Wesley testified that he attended the first 30-45 minutes of Fuller's autopsy, and that initially Dr. Traylor stated that the wound to Fuller's chest was an entry wound. Det. Wesley included that information in his arrest warrant application, but that information was later corrected by Dr. Traylor's autopsy report. Det. Wesley did not request that a synthetic marijuana test be performed. Det. Wesley requested that the crime lab analyze the DNA swab of the brass knuckles, but as of the date of his testimony, it had not done so. Det. Wesley said that there was nothing in Fuller's history to suggest that he used synthetic marijuana. The state rested.

The defense called Goode to testify. She stated that she spoke with Cotton shortly after the shooting and that he was "hysterical" and crying, and that she could not understand most of what he was saying. Law enforcement contacted her and asked if she had seen him; she told them she had not and gave the officers Cotton's phone number. Goode heard from Cotton several times a month prior to the shooting, but afterwards, he did not contact her.

Following a colloquy where defendant was informed of his right to remain silent, Cotton elected to testify in his own defense. Cotton stated that he was 53 years old at the time of trial and Fuller was his half-brother; the two shared a father. Cotton stated that he has several misdemeanor and felony convictions for various crimes, including several drug offenses, theft offenses, simple battery, simple robbery, and two charges of domestic abuse battery.

10

Cotton stated that Fuller borrowed money from him, and he waited several months for Fuller to pay him back; on August 18, 2021, Cotton went to Gloria's house to talk to Fuller about getting his money. He parked his girlfriend's car, a Chevy Impala, near Gloria's Escalade. Cotton stated that Fuller was outside the house when he arrived, but he did not acknowledge or speak to Cotton. Cotton said that he was smoking in the Impala for a minute after he arrived, and as he put out his cigarette, he saw that there was a gun in the compartment under the radio; the gun was initially covered with something. Cotton testified that the gun was not his, he did not put it in the car, and having the gun in the car made him nervous, because he was a convicted felon. Cotton picked up the gun, "slid the rack" to make sure there was not a round in the chamber and then slid the gun between the seats. He exited the car and locked the door.

Cotton went to the carport, Gloria asked who was there, he responded and entered the carport. Cotton observed Fuller in the laundry room talking on his phone and "sacking up a couple of ounces of cocaine." Fuller ended his call and walked by Cotton without saying anything to him. Cotton stated that he followed him outside and asked for his money. Cotton testified that Fuller reached into the back of the Escalade, pulled out and put on a pair of brass knuckles, and swung at defendant. Cotton said that he deflected the first blow, but Fuller hit him repeatedly on his body, from his forearms to his hips. Cotton said that he was backing away from Fuller and he lost his footing and went down to his knees at the front of the Impala.

Cotton said that he begged Fuller to stop beating him and told him that he could keep the money. Fuller stopped hitting Cotton and moved away. Cotton then cursed at Fuller, who proceeded to hit defendant again

11

using the brass knuckles. Cotton said that Fuller backed him up toward the Impala and that he thought he was going to die. Cotton said that he used his car door as a shield and he fell to his hands and knees again and begged for Fuller to stop beating him.

Cotton stated that Fuller stopped hitting him and walked away again. Cotton testified that he unlocked the car door while on his knees, leaving the keys in the door. Cotton again cursed at Fuller, who started toward him again. Cotton testified that he then grabbed the gun from the car, cocked it, and fired. Cotton stated that he fired one round, but Fuller was still coming, so he pulled the trigger two more times and hit Fuller. Cotton said that he had never fired a gun before. Fuller fell back against the Escalade and fell to the ground. Cotton stated, "[H]e's not coming no more. He's immobilized." Cotton then said that he turned to get his phone from his car to call 911, when he heard Fuller say, "Mama, throw me my gun."

Cotton testified that he turned, saw Fuller's arm outstretched and reaching, so he fired several more shots to stop Fuller from getting whatever he was reaching for. Cotton said that he left in the Impala, because he was afraid Fuller was going to get a gun and kill him, or that Gloria would see Fuller on the ground and try to kill him. Cotton said that he drove around the corner and called 911. The 911 call was admitted and played for the jury. In the call, Cotton can be heard crying and screaming; he mentioned brass knuckles and gave his name. Cotton stated that, after calling 911, he went to the Red Roof Inn, where he stayed the rest of the evening.

Cotton said that his girlfriend took photographs of the bruising to his body from being struck with the brass knuckles. Four photographs depicting bruising were admitted. The photos only depict a person's body, and do not

12

show the person's face. Three of the photos depict the same area of bruising on the person's body.

Cotton said he did not want to turn himself in, because there was coronavirus in the jail and he was not vaccinated. He said that he did not think he would be charged in this case, because Fuller beat him using brass knuckles and he feared for his life while Fuller was hitting him. Cotton said that he was unaware that there was a warrant for his arrest for shooting Fuller. Cotton explained that he did not remove the brass knuckles from Fuller's body or place them and a cell phone in the back of the Escalade. Cotton said that neither was inside the hatch of the SUV when he walked by it to get into the carport at Gloria's house.

Cotton gave the following testimony on cross-examination. He stated that he was aware that he was not allowed to possess a firearm. He said he had been using his girlfriend's car off and on for about one to two weeks prior to August 18, 2021, and his girlfriend's adult son also used the car during that period. Cotton suggested that her son placed the gun in the car. Cotton stated that when he put out his cigarette in the car's ashtray, he disturbed what was covering the gun, he saw something shiny, reached for it, and saw that it was a gun. He said he was "freaking out" about there being a gun in the car. When asked why he did not relocate the gun to a secure location, like the trunk, Cotton stated, "[I]t wouldn't matter. If I got stopped in that car by a police officer, and that gun is in the glove box…do I get convicted felon with a firearm?"

Cotton said that he was unfamiliar with firearms, but he watched a YouTube video about how firearms work. He said he was not sure if the magazine was in the gun when he slid the rack, which would have loaded a

13

round into the chamber if the magazine was present. Cotton said the safety on the handgun "must not have been on," when he handled and fired the weapon.

When he arrived at Gloria's house, he sat in his car for three to four minutes before he walked toward the carport. Cotton said that he did not stand outside the carport rustling the plastic sheeting as Gloria testified and he was not under the influence of drugs or alcohol. He again said that Fuller was "sacking up cocaine" when he first saw him inside Gloria's house. Cotton said that he did not know what happened to the cocaine that Fuller allegedly had, when questioned about why Fuller was not found with cocaine and none was found at the crime scene.

Cotton said that Fuller's "drug of choice" was codeine syrup which he said showed up on Fuller's toxicology report from Dr. Traylor. When the state said that the only drug present in Fuller's body at the time of his death was natural marijuana, Cotton said that he misread the results of the report, saying that he confused codeine with cocaine. Cotton said that when he used cocaine, he got it from Fuller.

Cotton alleged that he thought there was a surveillance camera that caught his altercation with Fuller, which is why he believed he would not be charged in the case. Cotton said that the first time Fuller hit him with the brass knuckles he did not feel like his life was threatened, but he just felt like he "got beat." Cotton said that he walked to the driver's side of the Impala, because he knew if Fuller beat him again, he could get at the gun. Cotton said that he was not yelling when Fuller beat him, but he was making loud noises.

14

Cotton said that he was 6 feet, 200 pounds and was not afraid Gloria would physically hurt him. He said that he did not seek medical attention for his injuries and he did not have any broken skin or bones from his altercation with Fuller. When asked, "That injury meant that you had to use a firearm to shoot him," Cotton responded, "He had a weapon. That was the only weapon I had."

Cotton testified that he stopped speaking to his mother after his initial conversation after he shot Fuller, because he didn't want her "harboring a fugitive." Cotton said the brass knuckles were on Fuller's person when he left the scene.

Cotton gave the following testimony on redirect. He stated that the entire encounter between himself and Fuller took about one minute. He said he was not sure where he hit Fuller when he first shot him, and when Fuller fell to the ground, he was crawling and he had his hand up. Cotton said that he was afraid he was going to receive immediate bodily injury, including when Fuller called for a gun.

Det. Wesley testified again and said that he attempted to canvass neighbors and other witnesses near Gloria's house, but most people did not want to speak with him. Det. Wesley found no functioning surveillance cameras at the scene that recorded the alleged altercation between Fuller and defendant. Det. Wesley stated that he did not follow up with the crime lab to determine if they had tested the DNA swab from the brass knuckles or a DNA sample taken from Cotton.

Det. Wesley stated that there was no evidence of cocaine at the scene or of guns other than the one used to shoot Fuller. Det. Wesley stated that

15

he learned after his earlier testimony that the DNA swab taken from the brass knuckles was never submitted to the crime lab.

Michelle Jackson ("Jackson"), the DNA Section Supervisor at the North Louisiana Crime Lab, testified that Cotton's DNA sample was submitted to the crime lab, was never tested, and was returned to SPD and that no DNA swab of brass knuckles was submitted to the crime lab for testing. The defense rested.

Gloria testified as a rebuttal witness for the state. She said that if Fuller had been dealing cocaine out of her home, she would have known about it. She said that her son did not do so and she never saw him with cocaine at her house.

The trial court then gave instructions to the jury, which included the following language:

> There are several factors that you should consider in determining whether the defendant had a reasonable belief that the killing was necessary to save himself from that danger:
>
> (1) The possibility of avoiding the necessity of taking human life by retreat, provided however, that a person who is not engaged in any unlawful activity and in a place where he or she has a right to be, has no duty to retreat before using deadly force to save himself from the danger of losing his life or receiving great bodily harm. He may stand his ground and meet force with force.

The jury rendered a unanimous verdict, finding Cotton guilty as charged. On February 14, 2023, a sentencing hearing was held. Cotton filed a motion for a new trial and a motion for a post-verdict judgment of acquittal. The trial court denied both motions, and Cotton waived all sentencing delays. The trial court advised Cotton of his appellate and post-conviction relief time limits. The trial court considered the factors from La.

C. Cr. P. art. 894.1 and sentenced Cotton to life imprisonment at hard labor without benefits. Defendant now appeals.

## DISCUSSION

*Sufficiency of the Evidence*

In his first assignment of error, Cotton argues that the evidence admitted at trial was insufficient to prove beyond a reasonable doubt that he was guilty of second-degree murder, because he acted in self-defense when he shot his half-brother. In his second assignment of error, Cotton makes the alternative argument that, if this court finds that the killing was not done in self-defense, the evidence supports a conviction of manslaughter. We will consider the first two assignments of error together.

Cotton claims that he reasonably believed he was acting in self-defense when he shot Fuller. He argues that Off. Clark's and Det. Wesley's testimony that they did not notice any blood, dirt, or moisture on the brass knuckles contradicts the report of Sgt. Mendels, which stated that there were water droplets present on the brass knuckles in the back of the Escalade. Cotton states that he was lawfully at Gloria's house and that when Fuller attacked him, he had the right to prevent a forcible offense against his person. He states that he was in fear for his life, and that Fuller was advancing on him when he shot at him. Fuller continued to advance on him when he shot at him again. Fuller fell to the ground, but yelled for his mother to throw a gun to him, and Cotton then shot him several more times. Cotton argues that Fuller was the aggressor and he believed Fuller was going to kill him or seriously injure him. He claims that the state failed to prove that he did not act in self-defense when he shot Fuller.

17

In the alternative, Cotton argues that, if this court finds that he did not act in self-defense, the evidence supports a conviction for manslaughter. He states that what happened in this case was a fight between half-brothers that got out of control. He contends that he was provoked by Fuller and, after being attacked by Fuller a third time, he decided to defend himself by getting the gun out of his girlfriend's car and shooting Fuller.

The state argues that the question of who killed Fuller is not an issue. The state contends that Cotton killed Fuller and intended to kill him when he shot him. He had the requisite specific intent to kill Fuller when he shot him five times, and several of those shots occurred when Fuller was already on the ground and debilitated. Cotton fled the scene and avoided apprehension for over two months. The state also argues that Cotton's "self-serving facts" were at odds with the evidence presented. Cotton claimed he had never fired a gun before, but he hit the victim with five of seven shots. Cotton never explained how he shot Fuller in the back except in his jail call to his mother. Cotton stated he was very concerned about being a convicted felon in possession of a firearm, but he did nothing to place the gun outside of his possession.

The state argues that Cotton stated that Fuller was outside when he arrived at the house, but was inside when he walked into the carport. He also claimed there were drugs at the scene, but no drugs were found. Cotton changed his story while testifying about whether he got into an argument with Fuller. The photos he had admitted that allegedly depicted the injuries Fuller inflicted on him, show only bruising on his back, but he testified that he was bruised on his arms and body. The photos also do not show that he was the person photographed, because they do not show his face. The state

18

contends that this court is not allowed to assess credibility or reweigh evidence. The state argues that the evidence does not support a finding that Fuller's killing was committed in a sudden heat of passion or under other circumstances limiting the verdict to a manslaughter conviction. The state asks that this court find that the evidence was sufficient to support a second-degree murder conviction.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Parks*, 54,888 (La. App. 2 Cir. 12/14/22), 352 So. 3d 166. This standard, now codified in La. C. Cr. P. art. 821, does not afford an appellate court with a means to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Johnson*, 55,254 (La. App. 2 Cir. 8/9/23), 370 So. 3d 91.

The *Jackson* standard is applicable to cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the

19

crime.  *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Anderson*, 55,168 (La. App. 2 Cir. 9/27/23), __ So. 3d __, 2023 WL 6280114.

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.  *State v. Johnson, supra.*  If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence.  La. R.S. 15:438; *State v. Wayne*, 55,052 (La. App. 2 Cir. 6/28/23), 367 So. 3d 924.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence.  *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442.  Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part.  *State v. Wayne, supra.*  Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.  *Id.*

In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.  *State v. Coffey*, 54,729 (La. App. 2 Cir. 9/21/22), 349 So. 3d 647, *writ denied*, 22-01574 (La. 12/20/22), 352 So. 3d 89; *State v. Wilson*, 50,418 (La. App. 2 Cir. 4/6/16), 189 So. 3d 513, *writ denied*, 16-0793 (La. 4/13/17), 218 So. 3d 629. In the present case, Cotton was convicted of second-degree murder in violation of La. R.S. 14:30.1, which is defined, in pertinent part, as "the killing of a human being…when the offender has a specific intent to kill or inflict great bodily harm[.]"

20

Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and the actions of the defendant. *State v. Wayne, supra.* Specific intent can be formed in an instant. *State v. Alexander*, 51,918 (La. App. 2 Cir. 4/11/18), 247 So. 3d 981, *writ denied*, 18-0805 (La. 2/11/19), 263 So. 3d 436.

The discharge of a firearm at close range and aimed at a person is indicative of specific intent to kill or inflict great bodily harm upon that person. *State v. Wayne, supra.* Specific intent to kill may also be inferred from the extent and severity of the victim's injuries and the defendant's use of a deadly weapon to produce those injuries, which involved serious risk of death. *State v. Alexander, supra.* The determination of whether the requisite intent to kill is present is a question for the trier of fact. *State v. Walker*, 51,217 (La. App. 2 Cir. 5/17/17), 221 So. 3d 951, *writ denied*, 17-1101 (La. 6/1/18), 243 So. 3d 1064.

When a defendant raises self-defense as an issue, the burden is on the state to prove beyond a reasonable doubt that the homicide was not perpetrated in self-defense. We must consider whether the state met that burden. La. R.S. 14:20 provides, in pertinent part:

A. A homicide is justifiable:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its

21

prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.

…

C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.

D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.

Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Crow*, 52,817 (La. App. 2 Cir. 6/26/19), 278 So. 3d 416. Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. *State v. Wilkins*, 13-2539 (La. 1/15/14), 131 So. 3d 839; *State v. Johnson*, *supra*.

When the defendant challenges the sufficiency of the evidence in a self-defense case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in the defense of others. *State v. Crow, supra*.

Regarding Cotton's alternative claim that he should have been convicted of the lesser offense of manslaughter, La. R.S. 14:31(A) provides, in pertinent part:

22

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood had actually cooled, at the time the offense was committed; or

(2) A homicide committed, without any intent to cause death or great bodily harm.

Accordingly, for murder to be reduced to manslaughter, the following must be proved: (1) the homicide was committed "in sudden passion or heat of blood"; (2) that sudden passion or heat of blood was immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection; (3) the defendant's blood did not cool between the provocation and the killing; and (4) an average person's blood would not have cooled between the provocation and the killing. *State v. McGee*, 51,977 (La. App. 2 Cir. 4/3/19), 316 So. 3d 1196.

A defendant who claims provocation as a means of reducing murder to manslaughter bears the burden of proving these elements by a preponderance of the evidence; additionally, provocation and the time for cooling are questions for the jury to determine according to the standard of the average or ordinary person. *State v. Leger*, 05-0011 (La. 7/10/06), 936 So. 2d 108, *cert. denied*, 549 U.S. 1221, 127 S. Ct. 1279, 167 L. Ed. 2d 100 (2007); *State v. McGee*, *supra*. Or, this court must determine that Cotton shot at his brother not intending to kill him. La. R.S. 14:31.

There is no question here that Cotton shot and killed Fuller; he admitted that he did so. The jury was tasked with considering whether defendant killed his brother because he reasonably believed that he was in

imminent danger of losing his life.  Cotton was unable to persuade the members of the jury that he acted in self-defense.

Cotton stated that Fuller beat him with brass knuckles and walked away twice, before advancing on Cotton a third time, at which point, Cotton fired several shots at him.  Fuller fell to the ground and Cotton alleged that he called for his mother to throw him his gun while reaching from where he was lying on the ground.  Cotton then fired more shots at him.  Two of the shots were fatal.

As stated, the shooting of a firearm at close range and aimed at the person is indicative of specific intent to kill or inflict great bodily harm upon the victim.  Cotton fired two sets of shots at Fuller showing his intent to hit him with the projectiles.  Cotton's testimony that Fuller was moving toward him when he shot the victim is inconsistent with Dr. Traylor's testimony that Fuller was shot five times in the back, meaning that he was not facing Cotton when defendant shot him.  Dr. Traylor also testified that it was impossible for victim to have sustained his injuries as Cotton described.

Cotton stated that the first time that Fuller hit him with the brass knuckles he was not in fear for his life, but, rather, he felt like he "got beat." While there is no unqualified duty to retreat, Cotton was presented with two opportunities during his alleged confrontation with his brother to stop the altercation and deescalate the situation.  He chose not to do so.

Cotton attempted to paint his brother as a violent individual engaged in criminal activity.  He said that his brother got his nickname "Maniac" as an adult.  He testified that his brother was preparing cocaine for distribution when Cotton arrived at Gloria's home, and he suggested that Fuller was under the influence of synthetic marijuana at the time he supposedly

24

attacked Cotton. Cotton said that his brother like to take codeine syrup, but later backtracked and said Fuller preferred cocaine. Gloria and Cain testified that Fuller got his nickname when he was a child. Fuller's autopsy report showed only that he had natural marijuana in his system at the time he was killed, though he was not tested for synthetic marijuana. The only evidence presented regarding Fuller's criminal history was a conviction for attempted possession with intent to distribute marijuana.

Richardson and Gloria, who were nearby at the time of the shooting, testified that they heard no voices or sounds of arguing prior to hearing gunshots, which conflicted with Cotton's testimony that he made noises and yelled at Fuller prior to shooting him. Richardson and Gloria also stated that they heard several shots, a pause, and then additional shots, which is consistent with Cotton's testimony. Cotton said that he heard Fuller say, "Mama, throw me my gun," but Gloria testified that she never heard her son say that. Also, Dr. Traylor testified that Fuller would have been debilitated and unable to fight back after he was shot, meaning he would have been unable to place the brass knuckles in the SUV. Cotton himself testified that Fuller was "immobilized" when he shot him the first time.

The jury was also presented with evidence revealing that Cotton fled the scene after the shooting, which does not comport with that of a person who believed he acted in self-defense. Cotton also said that he did not contact his mother but one time between the shooting and his arrest, because he did not want her to get into trouble for harboring a fugitive.

Off. Visciotti testified that when he arrived on scene, Fuller was lying face-down in standing water; his hands were also in the water. The recording from his dash cam confirmed his testimony. Det. Wesley, Off.

25

Visciotti, and Sgt. Clark testified that there was no moisture, blood, or debris on the brass knuckles found in the hatch of the Escalade. Off. Visciotti and Det. Wesley stated that the brass knuckles and cell phone were placed side-by-side in the hatch of the SUV and had not been thrown into the vehicle.

Cotton testified that Fuller was wearing the brass knuckles when he left the scene, and he suggested that Gloria removed the brass knuckles from Fuller's body and placed them in the back of the SUV. Gloria's testimony, her 911 call, and the dash cam recording show that Gloria was completely distraught by the shooting of her son, and this court finds it improbable that she would have been able to remove brass knuckles from the hand of her dead or dying son and neatly place them in the back of the SUV. Dr. Traylor and Sgt. Clark stated that they did not observe any bruising or cuts to Fuller's hands, and the post mortem photographs do not show any injuries to his hands. Gloria and Cain stated that they had never seen Fuller with brass knuckles or had known him to wear or carry the weapon.

Cotton testified that Fuller was "sacking up" cocaine when he arrived, and the victim took that cocaine with him outside to the Escalade. However, no cocaine or other drugs were found at the scene. Cotton was unable to explain where the drugs went when questioned.

Cotton's belief that the use of deadly force was necessary to avoid the danger was not reasonable. He had opportunities to end the alleged violent encounter with his brother. In addition, it is the jury that determines credibility. They were able to hear Cotton's account of what happened, as well as the testimony of the other witnesses, and they chose to believe a different version of events than Cotton presented.

26

Regarding Cotton's alternative claim that the evidence supports a conviction of manslaughter instead of second-degree murder, we do not agree. Cotton testified that his brother hit him with brass knuckles then stopped hitting him and walked away. Cotton cursed at him, his brother began hitting him again, but then stopped a second time and once more walked away. Cotton again cursed at Fuller, who advanced on him again, at which point Cotton shot him.

For murder to be manslaughter, the law requires that the homicide was committed in sudden passion or heat of blood, that sudden passion or heat of blood was immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection, that the defendant's blood did not cool between the provocation and the killing, and an average person's blood would not have cooled between the provocation and the killing. Cotton alleged that Fuller paused twice in beating him and walked away. Cotton was able to then curse at his brother about the money Fuller purportedly owed him.

Such testimony is sufficient to find that Cotton was not robbed of his self-control or cool reflection and that his blood had cooled between when Fuller allegedly hit him and when Cotton then shot his brother. Fuller also fell to the ground, "immobilized," and was unable to further harm defendant before Cotton shot him again. Cotton provided the self-serving testimony that Fuller sought a gun after he was first shot, but the jury did not find that testimony persuasive.

The jury was instructed that it could return the responsive verdict of manslaughter, but it chose not to do so. We find no evidence in the record

27

which convinces this court to disturb the jury's verdict. The first two assignments of error lack merit.

*Ineffective Assistance of Counsel*

In his third assignment of error, Cotton claims that his trial counsel was ineffective for failing to object to the erroneous jury instruction on self-defense. Cotton argues that his trial counsel erred when he did not object to the jury instruction that a factor to consider in determining whether he had a reasonable belief that killing Fuller was necessary was "the possibility of avoiding taking a human life by retreat." Cotton states that La. R.S. 14:20(D) forbids a finder of fact from considering the possibility of retreat in deciding whether the use of deadly force was reasonable. Cotton claims that the fact that he stood his ground and did not retreat, if in fact he could, should not have been considered by the jury in evaluating his self-defense claim. Cotton avers that he was prejudiced by his counsel's failure to object to the jury instruction about his duty to retreat, thereby denying him his right to a fair trial.

The state contends that the evidence supported that Cotton was engaged in unlawful activity at the time he killed Fuller. Cotton testified about his criminal history, including recent convictions for drug offenses for cocaine. Cotton stated that he knew that Fuller had a conviction for possession with intent to distribute marijuana. Cotton stated that he loaned money to Fuller and that he saw Fuller packaging and carrying cocaine outside of Gloria's house. He also admitted to the jury that he invested money in illegal activity. The state contends that the inference of illegal activity regarding the loan he sought to collect was before the jury.

28

The state also points out that Cotton took possession of a handgun he found in his girlfriend's vehicle and placed in an accessible location in the car. He admitted he was a convicted felon and knew he was prohibited from possessing a firearm, proving that Cotton was engaged in unlawful activity when he shot Fuller. The state claims the jury charge was correct and Cotton's conviction and sentence should be affirmed.

As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief in the trial court than by appeal. This is because post-conviction relief creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. However, when the record is sufficient, an appellate court may resolve this issue on direct appeal in the interest of judicial economy. *State v. Miller*, 54,897 (La. App. 2 Cir. 1/11/23), 355 So. 3d 1165, *writ denied*, 23-00200 (La. 12/5/23), __ So. 3d __, 2023 WL 8431706.

The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by U.S. Constitutional Amendment VI. *State v. Wry*, 591 So.2d 774 (La. App. 2 Cir. 1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

First, to establish that his attorney was ineffective, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that counsel's deficient performance prejudiced his defense and that, but for counsel's unprofessional errors, there is a reasonable probability

29

the outcome of the trial would have been different.  *Strickland, supra*; *State v. Miller, supra*.  A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment.  *State v Miller, supra*.

In considering the duty to retreat found in La. R.S. 14:20, the Louisiana Supreme Court said in *State v. Wells*, 14-1701, p. 11 (La. 12/8/15), 209 So. 3d 709, 716:

> This Court also found in *Wilkins*, that Section D's provision that "[n]o finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary," cannot be detached from Section C, which permits only those persons "who [are] not engaged in unlawful activity and who [are] in a place where [they have] a right to be" to stand their ground (which finding is also consistent with the legislative history described above).  Thus, this Court found that "[t]o the extent that subsection D effectuates the right conferred by Subsection C on an individual to 'stand his or her ground' without weighing the possibility of escape or retreat before responding with deadly force, an unqualified right that did not exist previously in Louisiana, the two subsections work in tandem, not separately, to make a substantive change in the law because they directly impact not only how trials are conducted, and how juries may be instructed, but also how individuals may conduct themselves when confronted with situations that they perceive, reasonably or not, to present an imminent threat to their own lives." (internal citations omitted.)

Here, the trial court instructed the jury by reading part of the language of La. R.S. 14:20 to it.  The jurors were instructed that Cotton had no duty to retreat before using deadly force provided that he was not engaged in unlawful activity.  Moreover, as stated in the previous section, jurors are permitted to consider the possibility of escape in determining whether a defendant had a reasonable belief that deadly force was necessary to avoid the danger of being killed or suffering great bodily harm.  Cotton admitted that he was in possession of a firearm as a convicted felon.  Thus, he was

engaged in unlawful activity. He also alleged that Fuller was in possession of cocaine, a controlled dangerous substance, which is also an unlawful activity. We do not find that the jury instructions were in error or that defense counsel was deficient in his performance for failing to object to the instructions.

Furthermore, harmless-error analysis applies to instructional errors so long as the error at issue does not categorically vitiate all the jury's findings. *State v. Wells, supra*. Under the harmless-error test of *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), the question is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*, 386 U.S. at 24, 87 S. Ct. at 828. In *Sullivan v. Louisiana,* 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993), the Supreme Court clarified that the inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.*, 508 U.S. at 279, 113 S. Ct. at 2081.

The jury here heard conflicting testimony about the events that led to Cotton shooting and killing Fuller. Cotton claimed self-defense, but witness testimony, specifically regarding the lack of voices or noises prior to the shooting, the lack of moisture, blood, and debris on the brass knuckles, and the placement of the brass knuckles in the back of the SUV, contradicts his story that he was attacked by Fuller. The jury rejected his self-defense theory and the possibility that Cotton was guilty of manslaughter. The verdict of guilty of second-degree murder was not attributable to the disputed portion of the jury instruction and defense counsel's failing to object to the jury charge did not prejudice defendant. This third assignment

31

of error lacks merit, and Cotton's conviction and sentence should be affirmed.

*Errors Patent*

The record was reviewed for errors patent and none were found.

## CONCLUSION

Defendant Carlin Tremell Cotton's conviction and sentence are affirmed.

**AFFIRMED.**